Granger, C. J.,
dissenting.
When the decision in this case was announced on February 5, 1884, I concurred. Although I did not believe that the members of the legislature, in fact, intended to authorize a mechanic’s lien upon a railroad bridge, it then seemed to me that they had so used the word “bridge” in the statute, that the courts must hold that, in law, the intent to create the lien existed. I then felt, as strongly as I do now, that the effect of such legislation is *56 unfair towards all who furnish material and labor for the construction of other parts of a railway; that it was contrary to the previous legislative policy that had never given such a lien for labor or material furnished in constructing a part of any structure without expressly extending that lien to the whole structure; and that it would greatly embarrass railroad companies in negotiating the loans so essential to the building of their roads. But I also believed that the legislature had the legal power to give a lien to the builder of a bridge, and to omit to give one to the builder of a railway embankment; to change its policy; to make unwise laws, and that the power of courts over statutes was limited to the enforcement of the legal meaning of their words construed in the light of subject matter and context.
There remained upon the docket another cause between the Smith Bridge Company and another railroad company in which the same question existed. The importance and difficulty of the question justified the court in delaying the entry of judgment in this case until after full argument of the other. Such argument and my own study and reflection have convinced me that the word “bridge,” as ordinarily used, does not include a railroad bridge, and I was unable to concur in the judgment sustaining the lien in the second case. It is unnecessary to report both causes, and I therefore recall my concurrence in the decision announced in February, and here briefly present the reasons for my dissent.
In its widest sense the word “bridge ” applies to any sort of structure extending from one point of support across an open space to another point of süpport, and of sufficient strength to permit the transit of some material object. But the usage of the people often takes charge of a word, and so applies it, that, when uttered, or written, without accompanying words, or context, the hearer, or reader, understands that the speaker, or writer, refers to one of a particular class of objects, instead of any one of many classes embraced by the fullest meaning of the word. Before any *57 railroad was constructed the word “bridge” in connection with roads and highways had, by the people, been thus applied to structures across streams for the passage of travellers in ordinary modes. A road led up to each end of such a structure. The traveller left the road and entered upon the bridge, and again left the bridge and took to the road. Constructively, in a legal sense purely, the road sometimes crossed the bridge, and the bridge was, sometimes, in like manner a part of the road; but actually, in fact, the bridge was distinct froan the road. Popularly then the word “ bridge ” came to mean a structure whose primary object was the support of persons, animals and vehicles while crossing a stream or ravine. This meaning belonged to the word when the first railroad bridge was built. What is the primary object of such a bridge ? What is the thing being constructed while it is being built? A railroad is a structure consisting mainly of a track, on which trains of cars, drawn by movable steam power, carry freight, and generally passengers. This track is formed of iron rails laid upon cross timbers, and is so supported a^ to make the grades practicable for the traffic intended. This support varies with the character of that portion of the earth’s surface traversed by the road. Sometimes it is solid rock cut down to grade, the bottom of a “ cut ” or “ tunnel”; the name depending upon the absence or presence of a roof. At other points this track rests upon an embankment, or passes along the even surface of favorable ground. Where the earth has been cut into drains for the passage of water necessity has required supports of still different kinds; and such parts of the railroad are for convenience named culverts, trestle work, bridges. For various good reasons many of these supports called bridges are constructed with sides and tops. One reason for this is the greater strength supposed to result from this form ; another may be the better protection of the material from the influence of the weather.
But the one thing made, built or constructed — the entirety —is “ a railroad.” The primary object of a railroad bridge is *58 to enable a railroad to cross a stream, or ravine, and to support the railroad in position. The railroad crosses the bridge. Railroad passengers simply travel on the railroad. When two things are alike only in principle, or in their general purpose, ordinary language calls them by different names. I think that ordinary usage, long before the passage of the act before us here, spoke of all bridges on ordinary highways (whether public, or private, turnpikes, or dirt roads) as simply “ bridges,” and of bridges under railways as “ railroad bridges,” or so connected the word “ bridge ” with other terms as to indicate that a bridge on a railway was intended. In which sense did the legislature use the word “ bridge ” in the mechanic’s lien acts ?
It may be useful to trace the history of Ohio legislation upon the subject of mechanics’ liens.
In 1823 (Chase, 2160), was passed “ An act to create a lien in certain cases.” This authorized a mechanics’ lien upon “ any house, boat, vessel, or other water craft, building or buildings, erected or constructed, after the taking effect of this act” within Cincinnati. In 1833 this act was extented to Fulton township, Hamilton county.
The act of March 12, 1840, extended said act to the counties of Hamilton, Washington, Montgomery, Scioto, Muskingum and Knox; and so broadened it as to “ extend the lien to all mechanics, laborers and furnishers, for the value of their labor, skill and materials, jointly or severally, therefor, on contract with the owner or owners, for all repairs, additions, or improvements, upon any house, boat, vessel, or other water craft, building or buildings whatsoever.” (38 Ohio Laws, 115, 116).
On March 11, 1843, the first general “mechanics’ lien law ” was passed.
The first section of this act (Swan, 1854, p. 551), authorized a lien upon a “ house, mill, manufactory, or other building or appurtenance, and the lot of ground upon which the same shall stand.”
The second section enabled one who did work or furnished material for a first contractor to secure a lien upon *59 the moneys coming to him under the contract by a notice to the owner. The marginal notes to the act call such persons “middlemen.”
In May, 1871 (68 Ohio Laws, 107), this second section was so amended that such a “ middleman ” could, by notice to the owner, acquire a lien upon moneys due from him to the first contractor for work or material furnished for a bridge, road, turnpike, street, railroad, &o.
In March, 1875 (72 Ohio Laws, 166), the first section of the act of 1848 was amended by substituting the words “ for erecting, repairing, removing, raising or lowering,” instead of the words “ for erecting or repairing,” and by inserting after the words “ or appurtenance ” the words “ or any portion thereof.”
At the same time said second section was again amended by introducing the words “removal, raising, lowering,” and by substituting “ apparatus ” for “ appurtenance.”
The act of March 31st, 1874 (71 Ohio Laws, 50), entitled “An act to secure pay to persons performing labor or furnishing materials in constructing railroads,” required railroad companies to provide, in the contract for the construction of a railroad, “ or any part thereof,,” for the payment of the labor, materials, &c., before any part of the contract price is paid to the contractor, and made the railroad company directly liable to the persons engaged under the head contractors in furnishing material, performing labor, furnishing board, &c.
Although this act seemed to accomplish the intention expressed in its title, sections 3207 to and including 3210, Revised Statutes, are yet more comprehensive.
But, prior to the enactment of the sections last named, the act of May 4, 1877 (74 Ohio Laws, 168), was passed. This was intended as a revision and amendment of prior mechanics’ lien laws, and it repealed the acts of 1843, 1871 and 1875. In this act the word “bridge’’made its first appearance in the first section; the section granting a lien to the first contractor upon structure and lot.
The third section provided, “ That any person who shall *60 perform labor or furnish materials for constructing, altering, or repairing any street, turnpike, road, sidewalk, way or drain, ditch, or sewer, by virtue of a private contract between him and the owner or owners of lands abutting thereon, his or their authorized agents, shall have a lien “for the payment of the same against said lands,” &c.
I remark, in passing, that while a railroad is “ a road,” and in certain connections is, in speech and writing, called “ the road,” it is apparent that the word “ road ” in this section, must be construed in its ordinary and popular sense, and that if the company happened to own any abutting land no lien thereon could be acquired under this section.
The rights of “ middlemen ” are provided for in the tenth section of the act, and no one is aided by it unless his sub-contract relates to the construction, alteration, removal .or repair of any property, appurtenance or structure, as described in the said first and third sections of this act.
It should be noted that this act repealed (as already stated) the act of 1871, under which a sub-contractor on a railroad was treated as entitled to all the rights of a middleman. It expressly provided for all persons recognized by the act of 1871, either as lien holders or as middlemen, except those doing work or furnishing materials for “ a distillery” or “a railroad.” It is possible that respect for the views of advocates of prohibition caused the omission of express protection to any contributor to the erection of a distillery, but no such reason can be supposed for the omission of “railroad.” I am satisfied that the legislative intent then was to treat the act of March 31, 1874 (71 Ohio Laws, 51), as sufficient for all “ persons performing labor, or “ furnishing materials, in constructing railroads, or any part thereof,” and therefore no reference to. a railroad was made by the act of 1877.
I think a careful review of this legislation justifies the following conclusions: -
(a) The tendency has been to make no distinction between those contributing to the construction of anything *61 upon which a lien is given, except by placing original contractors in one class, and sub-contractors in another.
(5) No lien upon a railroad has ever been granted.
(e) Unless the word “bridge” in the act of 1877, includes a “railroad bridge,” in no case has a lien been authorized upon a part of a structure unless under the like conditions, a lien upon the whole of that structure was expressly provided for.
Finding then that the word “ bridge,” before and in 1877, was popularly used in different senses; that generally it did not include a railroad bridge unless that meaning was indicated by the context or the circumstances under which it was used, I now think that it falls within the power, and is a duty, of the court to determine in which sense the legislature used the word in 1877.
In Rutherford v. The R. R. Co., 35 Ohio St., 559, the supreme court decided that the act did not authorize a lien upon a railroad. The opinion of the majority of the court in this case well shows that a lien upon the bridges can only be enforced by treating it as, in effect, a lien upon the railroad.
The result of the holding determines that the legislature granted a special privilege to one class of persons furnishing labor and materials for the construction of a railroad. It seems to me that such a result is by itself sufficient to demonstrate that, if the word “bridge” as used in the act is fairly susceptible of either of two meanings — one of which escapes such a result, the General Assembly intended that use. Thus the real difference between the majority of the court and myself may be considered as limited to this single point: I hold that in 1877, the word bridge in ordinary parlance did not include a railroad bridge, and that the legislature used it in that ordinary sense. The majority think otherwise. While thus announcing my dissent, I do it with a strong sense of the difficulties that environ the question.